ALMY, (JAY v.)

[See Jay v. Almy, Case No. 7,236.]

ALMY, (KENDALL v.)

[See Kendall v. Almy, Case No. 7,690.]

ALMY, (WALCOTT v.)

[See Walcott v. Almy, Case No. 17,052.]

## Case No. 256.

### ALMY v. WILBUR.

### SAME v. SAME.

[2 Woodb. & M. 371.][1]

Circuit Court, D. Rhode Island. Nov. Term, 1846.[2]

EQUITABLE MORTGAGES — FRAUDULENT TRANSFER OF PROPERTY BY MORTGAGOR — CONVERSION — RUNNING OF STATUTE OF LIMITATIONS.

1. Where A. promises B. to buy machinery of C., and let B. have it to use at an agreed price per yard for cloth made by it at B.'s factory, A. to furnish the raw cotton, and credit B. towards payment for the machinery, with what the cloth sells for beyond that price and expenses; it is not at law a mortgage of the machinery by B. to A., because the title did not come from A. to B., and their agreement was not made at the time A. got his title; but if an absolute debt from B. to A. existed, to be secured by a mortgage, and a memorandum at the bottom of the contract called the machinery collateral security for the money paid for it by A., and in the contract it was said to be security for the advance made, it may be deemed in equity a debt, though B. was said to be "at liberty" to pay the money advanced.

[Cited in Tufts v. Tufts, Case No. 14,233; Carr v. Gale, Id. 2,435.]

2. This contract may be deemed a mortgage of the machinery to B. in equity, and A. afterwards could not sell it legally to D. until he had paid B. all the debt; so that D., knowing the circumstances, or knowing enough to put him on inquiry, could not hold the machinery without paying B. the balance due.

[Cited in Bentley v. Phelps, Case No. 1,331; Tufts v. Tufts, Id. 14,233; Carr v. Gale, Id. 2,435.]

3. Such a contract, though a mortgage, need not be recorded in order to be valid between the parties to it, or those having notice of it. Possession by A. of such property, which had not been his before the mortgage, is not within the policy of the law as to its being evidence of fraud, either if a mortgage or not. Nor is the machinery under such a contract in the control and disposition of A. so as to render it liable for his debts to others, like property of third persons, in the power and disposal of bankrupts under the special provisions of bankrupt acts.

[Cited in Carr v. Gale, Case No. 2,435.]

4. A bill in chancery, asking D. to account for such machinery, and its rents and profits, may not be sustained on that ground, though it may be, when asking also, as here, a discovery also, which succeeded in developing facts important, and requested that D. should redeem the property mortgaged, or restore it, and the rent from it.

[Cited in Tufts v. Tufts, Case No. 14,233.]

5. The statute of limitations pleaded to it was held not to run till the demand by B. on D. and a refusal to return the machinery; the possession having been given to D. by one having the right to it, and no tort or conversion was elected to be considered as committed by D. till the demand and refusal.

6. A. or D. have a remedy against B. to perform his contract on tendering the balance due, and B. may have relief in chancery from his contract to convey, unless A. or D. will, within a reasonable time, pay the balance due to him.

7. If the statute of limitations run long

[1][Reported by Charles L. Woodbury, Esq., and George Minot, Esq.]

[2][Reversed under title of Wilbur v. Almy, 12 How. (53 U. S.) 180.]

enough to bar a debt secured by a mortgage, and has not barred a bill or suit as to the property, the debt is protected by the mortgaged property, and will not be barred till a suit for that is.

In equity. The first case was a bill in equity, [by Samson Almy against Peleg Wilbur,] filed, and notice served on the respondent, 17th October, 1842. It alleged, that, March 7, 1828, Rowland G. Hazard & Co. entered into an agreement with Christopher Lippitt to assume the payment of five hundred spindles, then purchased or contracted for by Lippitt, and to buy three hundred more, receiving from the vendors bills of sale for all of them, as security for the amount loaned, not to exceed $10,000; that Lippitt, on his part, agreed to use said machinery in his factory, at Jewett City, Conn., in making 4-4 brown sheeting, from thread 16 to 18 in numbers; receiving the cotton and delivering the goods at Providence, R. I., at three and a half cents per yard. It was further agreed that Hazard & Co. should perform all the services on their part, in purchases and sales, &c. without any charge of commissions, except in case of special guarantees; that the profits arising from this business should be equally divided between them and Lippitt; that it should begin immediately, and continue till 25th March, 1830; that if Lippitt's part of the profits and interest thereon should not be sufficient at any time to pay the money advanced by Hazard & Co., and to which it was to be applied, Lippitt was to be at liberty to continue the business in this way till it did pay the amount, or to have the privilege to pay the balance in two years, with interest; that on all moneys advanced by either party, except for the original purchase of the machinery, six per cent. interest was to be allowed, and settlements made semi-annually; that the machinery was to be held by Hazard & Co. only as collateral security for the money advanced and given up to Lippitt, on payment therefor, and till then to be kept insured by Lippitt for Hazard & Co. The bill next averred, that Hazard & Co. did assume the payments for the machinery, and for it and for what they purchased did advance $9,567.48, and took bills of sale of it in their own names; and immediately, viz. 7th March, 1828, began to supply Lippitt with cotton under the agreement, and to receive manufactured goods; that they failed in business 30th May, 1829, and assigned to T. B. Hazard and Charles Low, for the benefit of creditors, all their property in trust, including this machinery and contract. It was next averred, that, in the year 1829, the complainant agreed with R. G. Hazard, as agent of the assignees, that he, the complainant. would supply Lippitt with cotton, under and on the terms of said contract, and that he supplied it accordingly, and made sales, &c. until the 9th March, 1830, when he purchased of the assignees of R. G. Hazard & Co. all their interest in said machinery and contract; but Low and Fenner, named in the assignment or bill of sale, never redeemed their half of the contract, as provided, or paid any part of the expense, or furnished any cotton from 1829 to 1832; and thus, by their neglect and refusal, made the complainant, or acquiesced in his being solely interested in said contract and machinery. The bill further averred, that the complainant continued to furnish cotton and make sales under this contract till Sept. 11, 1832, from which time Lippitt refused and neglected to apply for any more cotton and to go on further under the contract, though he, the said Lippitt, had agreed to the assignment of the machinery and contract to the complainant, and had gone on with him under it since the assignment. The bill further averred, that the complainant, on the 18th of August, 1831, at the request of Lippitt, bought a double speeder, at the price of $550, for use in Lippitt's mill, being necessary for its successful operation; and on the 11th of September, 1832, there was due to the complainant $5,405.87 under the contract, and for which the machinery was pledged; yet Lippitt has paid no part thereof, nor delivered the machinery to the complainant, but transferred the same to the respondent, Peleg Wilbur, who now professes to hold it exonerated from any lien or claim by the complainant. It next averred, that Wilbur knew at the time of the transfer that the machinery was pledged to the plaintiff, and ought to pay him the balance due, and account for the use of the machinery and speeder, but refuses to do either; that on the 26th of November, 1836, he the plaintiff, demanded the machinery of Wilbur, who refused to deliver it up; and states that Lippitt would be made a party to this bill, but residing in the state of Connecticut, this court would have no jurisdiction over him in such case. Several special interrogatories were then propounded to Wilbur, and the bill concluded with a prayer that Wilbur be made to account for the value of the machinery and interest, and for the use of the machinery since Sept. 1832; or pay the balance due the plaintiff, including the $550 advanced for the double speeder, with interest; or restore the machinery and speeder, and pay reasonable rent since Sept. 1832.

The answer of Wilbur admits several of the allegations in the bill, such as the failure of Hazard & Co.; their agreement, as set out, with Lippitt; the furnishing of cotton and the double speeder by the plaintiff; and the demand made on him by the plaintiff's agent about Nov. 25, 1836, to return the machinery. But it denies any knowledge of the original agreement and its terms, till after a mortgage of the machinery, which he avers was made by Lippitt, to himself and others, Dec. 8, 1835. He further denies

that he then knew of any assignment to the plaintiff, or any refusal by Lippitt to go on with the contract, or any assent by Lippitt to the above named assignment, or to the complainant's holding said machinery pledged to pay his claims, or any interest by the plaintiff in the machinery itself, except on account of the double speeder. The answer further alleges, that Dec. 1, 1837, the respondent, for himself, and as attorney to the rest, conveyed all his interest thus acquired in said machinery to Morgan & Fanning; that the complainant stated to him, while furnishing cotton to Lippitt, that only a small sum remained due to him; that the mortgage to Wilbur conveyed other estate, and the debt thereby secured to him was bona fide; that from September, 1832, till the mortgage to Wilbur, Lippitt held and used the machinery as his own; and the respondent believed, and had reason to believe, that all the complainant's claims had been satisfied. That after the mortgage to him, he understood that claims existed by Hazard & Co. and the plaintiff on said machinery; but Lippitt denied their validity on the ground they were mortgages, and had never been recorded, and hence were invalid as against the defendant; and that the defendant received for his own interest in said mortgage only $407.54, but as attorney for others and himself received, in all, 1726.25, after deducting rent, $1040.

An amended answer was filed by Wilbur, which did not differ materially, except setting out some points more in detail, and pleading that no cause of action had accrued to the plaintiff within six years. The evidence in the case will be stated in the opinion of the court so far as material, except the original contract, a copy of which is annexed, marked (A.)

"(A.) This agreement made and entered into, between Christopher Lippitt, of Jewett City, Connecticut, of the one part, and R. G. Hazard & Co., of Providence, Rhode Island, on the other part, witnesseth,—that the said Hazard & Co. do hereby agree to assume the payments of certain parcels of machinery, amounting to five hundred spindles and preparation, now purchased or contracted for, by said Lippitt, and also for three hundred spindles and preparation, to be hereafter contracted for by him, the said Lippitt, they receiving bills of sale of the same, as security for the amount advanced, the amount not exceeding ten thousand dollars. And the said Lippitt, on his part, agrees to run the said machinery in his factory at Jewett City, for the benefit of the contracting parties, in manufacturing cotton into 4-4 brown sheetings. the yarn to be spun from No. 16 to No. 18, well woven and well manufactured in all respects, and pay all proper and necessary attention to the business of said mill, to receive the cotton in Providence, and deliver the goods there;

for and in consideration of which he is to receive three and one half cents, cash, per yard, which is to be in full for the manufacturing of said goods. The said Hazard & Co. further agree to pay all proper and necessary attention to purchasing the stock, disposing of the goods, negotiating drafts, and any and all other business which it may be requisite for them to attend to in Providence, and charge nothing for the same, unless they guarantee sales; in that case, the usual guarantee commissions to be allowed them. It is further agreed, that the profits arising from said business shall be equally divided between the contracting parties. This agreement to commence immediately, and continue until the 25th day of March, 1830; and if, at that time, the said Lippitt's part, or one half of the profits with the interest thereon, which are to be applied to the payment of the money advanced, should not be sufficient to pay said advance, he is to be at liberty to continue until it shall be paid for in this way, or to have the privilege of paying the deficit with the interest, from that time in two years from the termination of this contract. It is also understood, that interest, at the rate of six per cent. per annum, is to be allowed on all amounts received or paid by either of the contracting parties, (except the advance, on account of purchase of machinery,) from the time at which it was received, or paid, to the time of settlement, which is to be semi-annual, and balances then due, to the time of final settlement. The account with the factory, in consequence of this agreement, is to be kept with the Griswold factory, and all just charges against said factory, to be as binding on the contracting parties, as if entered in their names.

Charles P. Huntingdon,
James Steadman, Lawyer,
Comm.

"Providence, 3d Month, March 7, 1828.
"Signed,        R. G. Hazard & Co.
Christopher Lippitt.

"Witness to the agreement of the contracting parties,
T. C. Carpenter,
Asa Steadman.

"It is understood that the machinery, mentioned in the foregoing instrument, is only to be holden by the said Hazard & Co. as collateral security for the money advanced, and that it is to be given up to said Lippitt, on his refunding the said advance, until which time the said Lippitt hereby agrees to keep it insured.     C. Lippitt,
R. G. Hazard & Co.

"Providence, March 7, 1828."

In the written arguments by counsel it is stated, that an action at law of trover is also pending for this machinery in this court between these parties; and that if the complainant on the facts in this case should appear to be entitled to recover either in this

bill, or that action, judgment is to be rendered for the plaintiff. The action of trover is the second one at the head of this report.

Rivers and J. Whipple, for plaintiff.

Potter, A. Greene, and R. Greene, for respondent.

WOODBURY, Circuit Justice. This case has some features rather novel. No fraud or mistake is charged in the bill; no papers are asked to be given up or cancelled; nor any request made of an account of profits and receipts, which grow out of any general copartnership, or which are very intricate and difficult either to estimate or ascertain; nor is any specific performance desired of a contract made between these parties, that has been fulfilled on the part of the plaintiff, and not on the part of the respondent. But the complainant asks us to compel the respondent to pay for machinery, which is alleged to belong to the plaintiff with interest for the use of it since Sept. 11, 1832. Had the bill stopped here, our jurisdiction over it in chancery could not probably be maintained. But it goes farther, and, averring that said machinery had been pledged to R. G. Hazard & Co. by Lippitt, and by them assigned to Almy, the complainant, and having afterwards by Lippitt been transferred to the respondent, the bill asks that he be made to pay the balance of the sum advanced for said machinery, and for a double speeder since, with interest on the same; or to deliver up the machinery and speeder in good order, and pay rent and account for profits for them since Sept. 11, 1832.

This, though rather inartificially set out, as an application to compel the holder of mortgaged property to redeem or surrender the possession and account for profits, is probably the object contemplated, and is within the power of a court of chancery. Nor does any objection seem to be taken to this, as a proceeding in chancery, by the respondent; and this perhaps arises from the circumstance, that a suit at law in trover is pending for the machinery, and is to be considered by agreement in connection with this, and that the plaintiff is to have judgment, if, in the opinion of the court, entitled to recover in either.

It would have been better that this agreement about those suits had been printed with the record, and some particulars presented as to what is claimed in the suit at law, whether including the speeder or not, the time when the action was brought, the damages demanded, &c. But I now am informed that it embraces all the machinery, and was brought at the same term, and is for $10,000 damages. On the aspect of the whole case as now exhibited in the bill, answer and evidence, it must be confessed that not much reason is seen why ample redress may not be had at law; and when it can be, this court will not usually sustain proceedings in chancery to obtain relief. See Carpenter v. Providence Wash. Ins. Co., 4 How. [45 U. S.] 185. But on proper averments, giving to this court jurisdiction in equity, it can, in proper cases, and will sustain proceedings once duly begun there, though a good remedy exists at law. Much more will it be done if the relief here is more full or appropriate. See Foster v. Swasey, [Case No. 4,984;] Pierpont v. Fowle, [Id. 11,152.]

A discovery here was first asked of facts useful in a trial at law or equity, and the bill may have been necessary to compel it. After having failed to elicit any thing material, or having succeeded, a court of chancery frequently dismisses the bill, and lets the party use the evidence at law which he has thus obtained; but this will not always be done where the discovery has succeeded in material respects. Especially will it not be, if the lapse of time, or some other circumstance, would now render relief at law impracticable or defective, or so difficult as to justify this court in continuing its jurisdiction in equity over the case, having once legitimately got possession of it. It may be for a disclosure as well as for the payment of a mortgage of personal property by the holder of it; or it may be for a restoration of it specifically; and if not doing that, by being compelled to pay its value.

A bill in equity lies to get possession of a pledge, so as to sell it and pay the debt, or foreclose redemption, unless payment is soon made. 2 Story, Eq. Jur. § 1008. Equity alone at first allowed redemption after the day of payment had passed, and thus got jurisdiction over mortgages, (Id. § 1014;) and sometimes perhaps on the ground that accident prevented payment, or a mistake, or that a trust existed. A pledgee may force payment in equity, or get the article, and has a right to sell. Id. § 1032. Sometimes without suit, if the pledgee is in possession, a pledgor cannot regain possession unless tendering the balance due. Id. § 1033. As to mortgages and pledges, the suits are usually between the original parties; but here the plaintiff, as a good assignee, may enforce the contract, and the defendant, as a second mortgagee in possession, may well be held liable to pay the first mortgage, or surrender the property, to be sold and applied first to discharge the first lien. 1 Story, Eq. Jur. §§ 484, 486.

I say nothing farther, as to the accounting here, or a special partnership giving jurisdiction, as this bill is not to settle the quasi partnership concern or its accounts, but rather in that view the title to some of the property one of the partners put in. There may have been some idea here that chancery had jurisdiction of the matter, because, if not a mortgage, there was a trust connected with the delivery of the machinery to Lippitt under the contract, that

he might have a conveyance of the same, on paying the amount advanced; or that, in such an event, Lippitt might be entitled to a specific performance of the contract, and have a written transfer to himself of the machinery. And there is little doubt there was such a trust, if not a mortgage, evidenced in some degree by the possession of the machinery, and making part payments towards the money advanced; and such a contract as this could be enforced so as to compel the holder of the property to convey to Lippitt on a tender of the amount, if the want of mutuality should not appear and defeat it,—that is, the want of a mutual imperative obligation on Lippitt to pay and buy. But, notwithstanding such a trust or contract here, they were in favor of Lippitt. and not the complainant, and are not, and could not be set out by the latter as any ground for his recovery of the property. The only use he can make of such a trust or contract is by way of evidence; furnishing some reason or excuse why Lippitt was allowed under them so long to have possession of the machinery, and thus rebutting the inference from that possession, that any absolute title existed in Lippitt.

But one prayer in this bill may be deemed a request to enforce the payment of a mortgage of personal property; and though not against the mortgagor, yet it is against his assignee, claiming a right and title to the mortgaged property, and hence in equity bound to pay the balance due or surrender the mortgaged property, or, if that is destroyed and lost, to pay its value. This, and the material disclosures asked, do, in my view, give to us jurisdiction in equity. This is more important to the defendant than the plaintiff, as the latter has a suit at law, in which he can recover, if not in equity and with less embarrassment than in equity; and the jurisdiction is therefore retained on this side of the court, rather than the other alone, because it gives the defendant certain equitable benefits he would not enjoy at law in converting his contract into a mortgage, and also in obtaining allowances as to the debt of the plaintiff, and his own responsibilities for the machinery, which could not be given to him in the suit at law. Having jurisdiction then in this way, I shall proceed to submit some views on the further merits of the case, as they strike my mind after a careful examination; and shall grant redress to the plaintiff, if he seems entitled to any, on all the facts and equities of the case.

It is the better view of the facts at law, that the interest in the machinery, originally purchased by Lippitt and that purchased by Hazard & Co. became, by the bills of sale of it from the makers or former owners to Hazard & Co., and by their payment of all the consideration, vested absolutely in them. Their interest also became, by the transfer of their assignees, duly vest-

ed in the plaintiff, as likewise was vested the interest in the double speeder, which the plaintiff alone bought, and never conveyed to any one. They both stood as his in Sept. 1832, when Lippitt stopped taking cotton of the plaintiff. The objections to this view arise from two sources, and will be considered before examining the transactions subsequent to 1832.

The first source of exception is in the original contract, under which Hazard & Co. advanced the consideration, and took a conveyance of the title from third persons. That is a written contract with Lippitt, and is a part of the evidence in the case. But in considering the objection resting on a part of this contract, it is to be remembered, in the outset, that the title of Hazard & Co. to the machinery was not conveyed to them in it by Lippitt, though it is singular that this important fact is not distinctly set out in the bill; nor is it pretended that the consideration of that conveyance came from Lippitt at first. Theirs was then a perfect and absolute title at law from a third person, and obtained by acts and writings and payments, sufficient to vest and complete it in Hazard & Co. entirely, without any aid from the contract with Lippitt. But that contract led to it, and was connected with it, and therefore must be considered. It could, however, hardly change that conveyance at law to a conditional title or a mortgage, as the parties to it were not the same.

In the next place. it was not made at the time of the bills of sale to Hazard & Co. Now at law a defeasance, to make an absolute deed of land a mortgage, must generally run to the grantor, and be of the same date. See Shapley v. Rangeley, [Case No. 12,707.] But such a contract might create duties and obligations between the parties to it, in trust or otherwise, which at law as well as in equity courts would go far to protect by damages or enforce specifically, whenever an equitable ground for interference was established. How is that here? The contract stipulated, that after Hazard & Co. should take conveyances of the machinery and pay for it, limiting their advance to $10,000, Lippitt might run it in his factory on the terms which are detailed in the statement of the case from the bill. The parties seem to have expected, that in about two years, i. e. by March 25, 1830, half the profits might enable Lippitt to pay for the machinery. But if they did not, he was at liberty to pay for it from other sources in two years more, or proceed further with this arrangement. Interest was not to be paid on this advance; but probably the half profits were allowed to Hazard & Co. instead of that and their commissions for sales. Here the body of the agreement closes, and standing alone, except for one expression as to the bill of sale to R. Hazard & Co., being "security for the amount advanced," would

leave little doubt that the matter was a mere special contract by Hazard & Co. to buy the machinery of others, and lease it to Lippitt on certain terms. By those terms Lippitt might earn money and pay Hazard & Co. for it, or might abandon that interest and never pay for it, at his option, but be liable for rent or interest, unless these were compensated by the rate at which Lippitt let Hazard & Co. have the cloth, while Lippitt continued to carry it to them. But unfortunately, after the body of the contract closes, and after the signatures and attestation of witnesses, a memorandum is made and signed, which has created much of the difficulty as to the true construction of it. It is in these words:—"It is understood, that the machinery, mentioned in the foregoing instrument, is only to be holden by the said Hazard & Co. as collateral security for the money advanced, and that it is to be given up to said Lippitt on his refunding said advance, until which time the said Lippitt · hereby agrees to keep it insured." Now the impression, that this made the bills of sale from third persons to Hazard & Co. a mortgage, or that it converted the title of Hazard & Co. into that of mere pawnees, is probably not tenable at law, however it might be in equity. I entertain no doubt, that the parties regarded it in effect as a mortgage or pledge, though flung into the form of a mere special contract, either for greater security to those advancing the money, or to save writing two instruments. Both parties seem at times to have talked of the machinery as pledged or mortgaged to secure the original sum paid. In another view it might not be a mortgage at law, as it is doubtful whether any debt existed in favor of Hazard & Co. against Lippitt which he was bound to pay, and to recover which they could bring against him a separate suit. Such is not the express language of the contract. But a debt must exist in order to sustain the position, that this was a mortgage, there being generally no mortgage without a debt, if connected with money. Here Lippitt was "at liberty" to buy the machinery on paying the original price. But he was not expressly bound in any clause for that purpose, to buy and to pay. He seems rather to have been left at liberty to do as he pleased. Conway's Ex'rs v. Alexander, 7 Cranch, [11 U. S.] 218, 237; [Porter v. Nelson,]·4 N. H. 130.

Even in equity there must generally be mutuality to constitute a mortgage, or trust, or any thing tantamount to either; that is, there must be an imperative obligation to pay, on the one hand, or have been an actual payment or good consideration passed from the cestui que trust, or no good foundation exists for a promise or obligation to convey on the part of the trustee. See cases collected in Tufts v. Tufts, [Case No. 14,223;] Brashier v. Gratz, 6 Wheat. [19 U. S.] 528, 539; Delane v. Delane, 7 Brown, Parl. Cas. 279; [Guest v. Homfray,] 5 Ves. 818; [Shaftesbury v. Arrowsmith,] 4 Ves. 66. But going to the other words used, as to the machinery being held as "security for the amount advanced," and in the memorandum, being promised "to be given up" on Lippitt's paying the advance, a debt is perhaps sufficiently recognized and implied in the contract itself, and could be enforced as a debt in equity, if not at law; and it seems to me, that I should not do justice between these parties, unless I held this to be a mortgage at least in equity, and took jurisdiction in the case in equity on the grounds before named, in order to enforce what is legal and moral as to all. The cases in equity have gone so far as to consider that a mortgage, which is in form absolute, but where the relation of lender and borrower had existed, or great inequality of consideration was paid, or possession long left in the mortgagor, or a defeasance promised, and a variety of other circumstances, detailed in Hunter v. Marlboro', [Case No. 6,908,] and Bentley v. Phelps, [Id. 1,331,] and cases there cited. See, also, Porter v. Nelson, 4 N. H. 130. But still the idea of a debt due runs through most of the cases, deemed to be mortgages there; and it probably existed here, a debt to be paid in a peculiar manner, but still a debt.

The whole object in the purchase, and all the relations of the parties to the subject, show the advances made by R. Hazard & Co. were to be considered by them in substance as a debt,—a debt to be paid in a special way, if the debtor pleased, till 1832; but a debt in the outset as well as afterward, and secured by letting the lenders take the original title from the vendors, rather than the latter conveying to the debtor, and he to the lenders. So the memorandum manifestly intended to compel Hazard & Co. to give up the machinery to Lippitt, if he paid for it, and in that way to hold it only as security for the sums advanced, as is mentioned in the body of the instrument. And if Lippitt had at any time paid the amount advanced, a court of law in an action against R. Hazard & ·Co: would give ample damages for a refusal to release the title to Lippitt, and a court of chancery would, in that event, probably compel a specific performance of this branch of the agreement. Burnham v. Rangeley, [Case No. 2,176;] Bentley v. Phelps, [Id. 1,331.] Surely they would, unless it was void for the want of a mutual obligation on the part of Lippitt to pay for and buy this machinery. The question, whether this was a mortgage or not at law, is very important; as the party has a suit at law, and may yet abandon this bill, and rely on that suit. And if not a mortgage at law, the contract, as a mere agreement about personal property, need not be recorded probably in any state. Swift v. Thompson, 9 Conn. 63; Talcott v. Wilcox, Id. 134. Every one knows that such contracts, when not mortgages, are never required either to be recorded or brought to the knowledge of sub-

sequent purchasers, as mere contracts about personal estate.

There would be no harm to Lippitt in viewing this contract as a mortgage, and hence as a debt by Lippitt, except it would extend the original liability of Lippitt to pay for the machinery otherwise than by profits on the contract. That is of no consequence in this suit, unless being deemed a mortgage in equity, as it must then be, it need not, under the Connecticut statute, be recorded in order to be valid. Transactions are deemed mortgages in equity, which are not always in law. Flagg v. Mann, [Case No. 4,847;] [Lupton v. Cornell,] 4 Johns. Ch. 189. The statute of Connecticut appears to relate to mortgages in law, and must be so construed of course, where not otherwise reasonable. But more of this hereafter, and on it I shall give no decisive opinion, none being found to be necessary; and though recording, or a change of possession, or notice of a mortgage, may usually be proper, yet it may not be so necessary to prevent frauds on purchasers and creditors of the mortgagor in cases like this, as in others, where he had before the mortgage owned and controlled the property. First, then, was a change of possession necessary? and next, was recording? It was not necessary, under 13 Eliz., made to protect creditors, or 27 Eliz., made to protect purchasers, unless the vendor was the debtor, or the prior seller was. Where A. is a debtor, and sells property or mortgages it, then the possession ought to accompany the title, as a general principle; but if it does not, that circumstance alone does not vitiate the sale. Cadogan v. Kennett, Cowp. 434; Portland Bank v. Stacey, 4 Mass. 662. I am aware that some cases hold, if the possession be not then changed, that it is conclusive evidence of fraud, or per se fraud. Swift v. Thompson, 9 Conn. 63; Talcott v. Wilcox, Id. 134. While others consider it so as against subsequently attaching creditors, but not against purchasers. But the better doctrine seems to be as to a case like this, even if it be a mortgage, that, at common law, ([Bissell v. Hopkins,] 3 Cow. 166; [Badlam v. Tucker,] 1 Pick. 389; [Homes v. Crane,] 2 Pick. 607,) in case of a mortgage of personal property, if possession be not changed, it is not even prima facie of fraud. Ash v. Savage, 5 N. H. 547; 4 Mason, 534, [De Wolf v. Harris, Case No. 4,-221;] [Conard v. Atlantic Ins. Co.,] 1 Pet. [26 U. S.] 449; [Holbrook v. Baker,] 5 Greenl. 309. See Leland v. The Medora, [Case No. 8,237;] [Bucklin v. Thompson,] 1 J. J. Marsh. 223; Lewis v. Stevenson, 2 Hall, 82. Certainly possession retained by the mortgagor is not per se fraudulent, but may be honest, and so explained satisfactorily. De Wolf v. Harris, [Case No. 4,221;] 4 Mason, 537, [Phettiplace v. Sayles, Case No. 11,083;] Bissell v. Hopkins, 3 Cow. 166, 189, note; [Bartlett v. Williams,] 1

Pick. 288; [Badlam v. Tucker,] Id. 389; [Dawes v. Cope,] 4 Bin. 258. It is some evidence of fraud, but not conclusive. 1 Baldw. 533, 534, [Merrill v. Rinker, Case No. 9,471;] Smith v. Acker, 23 Wend. 653; 1 Gall. 419, [Meeker v. Wilson, Case No. 9,392.] In the present case the conveyance was from a third person, while in [Swift v. Thompson,] 9 Conn. 63, it was from a former owner and possessor still retaining it. Colby v. Cressey, 5 N. H. 238. In these cases of an absolute sale, possession so retained is, as in Twyne's Case, [3 Coke, 80; 1 Smith, Lead. Cas. (Amer. Ed.) 33,] a badge of fraud, but not conclusive upon it, unless it be admitted there is a trust, or it cannot be explained without a trust. Coburn v. Pickering, 3 N. H. 424; Parker v. Pattee, 4 N. H. 178; Trask v. Bowers, Id. 309; Haven v. Low, 2 N. H. 13; [Worseley v. Demattos,] 1 Burrows, 474, 477. In all these cases, the true inquiry is, where no statute exists, what was the intent in not changing the possession? If it was to benefit the vendor, to give him a secret trust or advantage or interest not parted with, and not appearing on the face of the contract, the jury should hold it satisfactory evidence of fraud. But if it was a part of the contract, as it usually is in mortgages, and more especially so in those of real estate, if it was consistent with the situation and rights of the parties, was open, public and honest, it should not be satisfactory evidence of fraud. See Leland v. The Medora, [Case No. 8,237.] It is not evidence of fraud if a mortgagor retains possession by the terms of the contract. U. S. v. Hooe, 3 Cranch, [7 U. S.] 75; [Conard v. Atlantic Ins. Co.,] 1 Pet. [26 U. S.] 449.

By the principle of the civil law the mortgagor retains the use of the thing pledged, unless there is a special agreement to have it go to the mortgagee to be used for the interest. Kaufman's Mack. 383. The mortgagor may then aliene the article mortgaged, but it passes subject to the prior mortgage, and if aliened without the consent of the prior mortgagee, it is by the civil law regarded as a species of theft. Id. The first mortgagee may enforce his right against every subsequent possessor. Id. 384. He who is prior in tempore is potior in jure in all these cases, unless the subsequent mortgage or lien is of a higher grade, or made to preserve the thing mortgaged. Id. 392. Such as the prior lien of the government for debts or taxes, and the bottomry subsequently made of a vessel in order to repair her. Id. 388, 389. See Leland v. The Medora, [Case No. 8,237.] Several of the decisions, which are supposed to conflict with these views, have been caused by an inadvertent conformity to the words and principles of the English bankrupt laws and the adjudications under them, when they are not at all in force here.

Here no conveyance having been made by

Lippitt to the plaintiff, nor any previous title having been in him, none of these cases are in point, which arise at common law, or under the statute of Elizabeth; and the only question is, whether Hazard & Co., by merely allowing him to have possession of the machinery under the contract till Sept. 1832, were per se guilty of a fraud; not whether buying of him and leaving him in possession would be evidence of a fraud. The act of 21 Jac. I., as to bankrupts, makes any property left in their possession and control, by the true owner, or with his consent, liable to be retained and go to the creditors of bankrupts as a part of their assets, on the ground that they were enabled thereby to obtain new and additional credit. [Gordon v. East India Co.,] 7 Term R. 228; [Darby v. Smith,] 8 Term R. 82; [Lingham v. Biggs,] 1 Bos. & P. 82; [Walker v. Burnell,] 1 Doug. 317; [Ryall v. Rowles,] 1 Ves. Sr. 348, 369; [Ryall v. Rolle,] 1 Atk. 166; [Francis v. Wyatt,] 3 Burrows, 1502; [Read v. Burley,] Cro. Eliz. 550, 596; 1 Hals. 260. But a power to dispose of or sell must be allowed or given by the true owner to bring a case within this statute. Jarman v. Woolloton, 3 Term R. 622; Collins v. Forbes, Id. 322. The language of 21 Jac. I., is: "If any person shall become bankrupt, and at such time shall by the consent of the true owner have in his possession, order and disposition any goods whereof he shall be the reputed owner, and take upon him the sale, alteration or disposition as owner," the commissioners on his estate may sell the same, &c. [Jarman v. Woolloton,] 3 Term R. 622. In this case there is no pretence, that the true owner consented or gave authority that Lippitt should dispose of or sell this machinery. So, if the bankrupt is in possession for a specific purpose of goods of another, his assignees cannot hold them. Cooke, Bankr. Laws, 320, 321; [Flyn v. Mathews,] 1 Atk. 185; [Walker v. Burnell,] 1 Doug. 317; [Collins v. Forbes,] 3 Term R. 316; [Salte v. Field,] 5 Term. R. 212. Such as to manufacture or use for a particular object, as here; for he then has not the right to sell as in case of goods, and the bankrupt law applies to merchants and selling and buying, and not to other claims. Not if possessed as debtor, or in right of a wife, her separate estate, or as factor. This was also a peculiar provision of the bankrupt system, not existing at common law, and of course was not applicable under that system even in England, except to merchants and others coming within its provisions. Nor is a mere temporary possession for a special purpose considered there within this principle as the taking possession is not then an act done to appear as owner. [Copeman v. Gallant,] 1 P. Wms. 318; [Godfrey v. Furzo,] 3 P. Wms. 185. So in Cadogan v. Kennett, Cowp. 434, though that was not the case of a bankrupt. Collins v. Forbes, 3 Term R. 316, was like the present case.

I am not aware, that the statute of James can be considered as in force, without the express enactments of the bankrupt system, which do not now exist here. Nor is there any analogy, which justifies their adoption, unless in point of fact the evidence shows that a person, becoming an insolvent, was allowed by the true owner to have possession and control of property, which he had not bought, and have it for the purpose of getting credit and to mislead others. Portland Bank v. Stacy, 4 Mass. 663; [Craig v. Ward,] 9 Johns. 197; Bac. Abr. "Bankrupt," F. There is no pretence that this was the design here. Most of the cases reported in England are under this special bankrupt act; and even that never could apply where the possession was given not to dispose of the article but for honest purposes and conformed to them, as to a written contract or deed. J. Buller, in [Haselinton v. Gill,] 3 Term R. 621, note. As if, on a quasi lease, or a contract to apply half the profits of its use towards the purchase; or wool to be manufactured, &c. Otherwise the principle would be, that every possessor of property could pass the title, whether he had any or not beyond mere naked possession, which has never been the law in this or perhaps any other country. Spring v. Coffin, 10 Mass. 33; Jarman v. Woolloton, per Ld. Kenyon, 3 Term R. 620. And though in such case, as in many others, the public might mistake where the real title was, and the possession for a length of years might induce the world to think the title had gone with it, yet every purchaser, if not every creditor, must run some risk as to title when he buys, beyond mere possession, and must inquire at his peril into the real truth as to ownership. "Caveat emptor" is the common law-maxim.

The original insurance showed, also, that Lippitt admitted the title to be in Hazard & Co.; and it was continued for them by Lippitt from 1828 to 1830, the year after their failure. After that Lippitt seems to have insured in his own name, though it is not pretended he got any new title or power till 1832 or 1835. It is possible, that in some cases the possession of property may be such by a bailee, or conditional owner or mortgagor or consignee, as to get credit on them, and bind them for the debts of the holder of the property in possession. Hussey v. Thornton, 4 Mass. 407. Such as the case of a sale and actual delivery under it, but void for fraud practised, yet till avoided, a purchaser from the occupant without notice of any original fraud will hold; for the former owner has allowed him not only to appear as owner, but to act so, and sell if he pleases. So in Rhode Island by statute, the consignor is deemed owner, to be liable for advances in case of consignments of goods to sell, (Rev. St. 1844, p. 279,) if the consignee be not aware he was not owner. So of an agent to sell in possession of them, he is deemed owner to cover new advances, not for old debts. But here

.it is hardly possible to suppose there was not notice enough to put Wilbur on inquiry, and even to be satisfied of the main facts. Or that Lippitt had any right, as agent, to sell this machinery like merchandise, or as a consignee, when he merely had it to use as a mechanic till paid for or returned.

A change of possession not being required by law in this case, or that possession should accompany the title of the mortgagee, how is the law as to the necessity of recording the mortgage? The requirement as to that is by statute alone. By the statute of Connecticut, (Ed. 1839,) tit. 2, mortgages of chattels or machinery, if recorded as mortgages of real estate, are good, though possession be not taken by the mortgagee. And page 391, tit. 57, deeds of real estate are not good, except against the grantor and his heirs, unless recorded. It is by no means certain, that the not recording of a mortgage of machinery renders it void, if the possession be not changed, when by the terms of the mortgage the possession was to be retained for use. Id. But if it was, the mortgage here was known by Wilbur to exist, and this both in law and equity has long been deemed equivalent, or a substitute for recording. For where by statute a mortgage must be recorded, notice of a prior mortgage to put a party on inquiry, is sufficient, though the mortgage be not recorded. [Porter v. Cole,] 4 Greenl. 27; [Rogers v. Jones,] 8 N. H. 264; [Kendall v. Lawrence,] 22 Pick. 544; Stow v. Meserve, 13 N. H. 50. A second mortgagee with notice of a prior one is barred by it. [Jackson v. Van Valkenburgh,] 8 Cow. 260. So an assignee. [Lewis v. Stevenson,] 2 Hall, 63; [Stroud v. Lockart,] 4 Dall. [4 U. S.] 153. There is no reason why this principle should not apply to mortgages of personal property as well as of real. Again, whether an equitable mortgage like this need be recorded or not, I do not find it necessary to decide; but the following cases throw some light on the question: [Le Neve v. Le Neve,] 1 Ves. Sr. 64; [Berry v. Mutual Ins. Co.,] 2 Johns. Ch. 603; [Jackson v. Sharp,] 9 Johns. 163; [Dunham v. Dey,] 15 Johns. 555; [Jackson v. Burgott,] 10 Johns. 457; [Wiseman v. Westland,] 1 Younge & J. 121; [Davis v. Earl of Strathmore,] 16 Ves. 430; [Le Neve v. Le Neve,] 3 Atk. 650; [Bushell v. Bushell,] 1 Schoales & L. 100; [Doe v. Allsop,] 5 Barn. & Ald. 147. It is very doubtful, whether equitable mortgages, as liens, unless maritime ones, can be allowed to prevail against third persons, unless recorded, or notice of them otherwise exists. [Hodgson v. Dean,] 2 Sim. & S. 224; 2 Story, Eq. Jur. § 1020; 2 Eq. Cas. Abr. 615.

Having disposed of these questions, it is next contended, that other grounds should defeat a recovery by the plaintiff. Some arguments and authorities have been submitted to show, that the business between Haz-ard & Co. and Lippitt was that of a copartnership business, and is to be governed by the rules applicable to such transactions. It may have been a quasi partnership under the contract, so far as regards what was to be done in making and selling cloth, and dividing and applying the profits. But that arrangement was a matter distinct from the title and interests of the parties in the capital and machinery which was to be furnished and employed. As to this, which is the main question here, Lippitt was to furnish the building, water power, and labor in manufacturing, &c.; and Hazard & Co. to furnish the machinery, not costing over $10,-000, and buy the cotton, and sell the cloth without commissions, except paying three and a half cents per yard for making, and keeping half the profits, and applying the other half in Lippitt's behalf, towards paying Hazard & Co. for the machinery. But all this, it will be seen, does not change the title of Hazard & Co. to the machinery till paid for by Lippitt, any more than it changes Lippitt's title to the mill he was to furnish. If, however, either party afterwards neglected to fulfill his portion of the special contract or partnership, if any one pleases to call it so, that would give a remedy for redress on the contract. But it would not affect the title to what was owned by each, and would furnish no set-off as to either party in actions between either of them and other persons, to enforce their rights and titles in their own property. Hence if Lippitt suffered, as he pretends, by cotton not being furnished longer to him by the assignees of Hazard & Co., Lippitt had his remedy against them in an action if they violated the agreement; but he did not thereby become entitled to mortgage or sell their machinery, or convert it to his own use, until he had paid all they had advanced on account of it for him. So in respect to the possession being calculated to mislead, the point that it was held under a quasi partnership might be important to rebut any inference of fraud from such a possession, but would not otherwise bear on the title. It would explain the possession as honest and necessary to carry out the partnership, and would repel any intention to give credit, or enable Lippitt to get credit by possessing and using as his own what was not his own. In that view, this idea of a partnership in the use of the machinery might be very important, if the case otherwise looked like one fraudulent and deceptive, so as otherwise to be void. But this view would not subject the machinery to be taken for a private debt of one of the partners, much less subject it to be sold or mortgaged by one for his separate debt, when it was not, like merchandise, possessed even for partnership purposes, with a view of being sold at all. Rogers v. Batchelor. 12 Pet. [37 U. S.] 221; [Ex parte Hamper,] 17 Ves. 403, 404; Story,

Partn. 41. The other source of objection, that the title of the plaintiff is not clear and perfect, exists in the claims set up by Low & Fenner to some interest in the machinery, in conjunction with Hazard & Co., or as a portion of their assignees.

Low & Fenner seem to claim an interest in the original contract, by some arrangement other than the assignment, to them and others, of Hazard & Co.'s estate. But it is proved so imperfectly, and was repudiated by them so absolutely at first, and is so clearly shown to have been never fulfilled by them, that I find judgment has once been rendered in this court against their claim under any such contract. Kendall v. Almy, [Case No. 7,690.] In respect to the claim of Low & Fenner, merely as being one of the assignees of Hazard & Co., it is to be presumed they declined to act under that assignment, and acquiesced in the other assignees taking the control of all Hazard & Co.'s interest and conveying it to Almy. They assented to Almy's holding the whole, 2 Sum. 294. [Kendall v. Almy, supra.] It was an assent or ratification of what had been done by Almy. Such seem to be the facts as now developed; and it cannot be permitted to them, or their assigns, to blow hot and cold as to the same transaction; and at one time disclaim all interest, and refuse to go on; and at another to insist on an interest, when it is likely to prove advantageous. In answer to another objection, that the assignment to Almy, the plaintiff, is not proved to have been made at all, and hence that his right to recover fails, it is sufficient to say, that the bill affirms it was made before the mortgage to the defendant; and the answer does not deny this averment, but merely denies any knowledge of it before the mortgage.

Another objection still is, that the assignment to the plaintiff, though produced, is not proved to have been, in fact, executed at its date.

But the execution of it being established, it must be presumed to have taken place at its date, until the contrary appears. See Best, Pres. 116; U. S. v. Libby, [Case No. 15,597.] The date was four or five years previous to the mortgage. Besides this, all the evidence shows that Almy proceeded to furnish cotton under it, as if owner of the machinery, and even to purchase more machinery at Lippitt's request before the mortgage to the defendant. It appears, further, that Lippitt was informed by Almy and Hazard the day after the assignment, that Almy had become the owner, and Lippitt so treated him afterwards. Whether the defendant had notice of this or not, is of no consequence in respect to the title having thus become actually vested in the plaintiff. I should not be surprised if Almy took the conveyance to oblige Lippitt, as well as secure his own claim, and that R. G. Hazard, as he swears, was to render future assistance in prosecuting the business. This will account for much in the case, otherwise extraordinary, e. g. the continued interest and future active part taken by R. G. Hazard; also the willingness of Almy to consult the Hazards before buying more machinery, and his anxiety to have Lippitt buy the machinery and pay the balance; and Almy's reluctance to go on longer, when Low began, in 1832, to set up claims to the property, which he had before repudiated, and to speak of his (Almy's) own interest, (that is, probably independent of what had been assigned,) as small, it being only the cost of the double speeder. The real beneficial interest seems chiefly to have been in R. G. Hazard, the original advancer of the money for the machinery, and then in Almy only as his assignee, except for the double speeder. R. G. Hazard, wishing to pay his own debts, would be most anxious naturally for Lippitt to go on and pay this money; and when Lippitt suspended or stopped doing it, R. G. Hazard, had his interest not been assigned and in other hands, would probably himself never have permitted matters to sleep as these did; and had Almy owned all the machinery in his own right, and not felt bound to consult R. G. Hazard, as being chiefly interested, and he often absent, would himself probably have taken earlier and more decisive steps about it.

Thus matters stood, when in September, 1832, Lippitt, ceasing to apply to the plaintiff for cotton, or to insure the property for him, or to bring cloth to him for sale under the contract, a condition of things new in some respects began: the time for paying for the machinery otherwise than with cloth had just expired. But there is no pretence in any of the evidence, that Lippitt had then paid the original advance by means of half the profits, or in any other way, except some confessions of the plaintiff sworn to by C. L. Lippitt, the son of Lippitt; nor is there any pretence from any quarter that the title was then released to him, or was asked to be released, or in any way became invested in Lippitt, except as inferred from other acts. It happens that their intercourse then ceased, and that Lippitt continued to use the machinery alone and independent of the contract, and insured it for himself. Almy ought then, for any thing which appears, to have instituted proceedings to recover his machinery, or enforce a collection of the balance of the debt still due to him. But that this change of conduct by Lippitt did not happen, in consequence of the advances having been all paid by Lippitt to Almy, is very clear from the account now exhibited by Almy and annexed to his bill, and the balance not pretended by Lippitt, who is a witness, ever to have been paid. In March, 1830, he seems in a letter to concede that something like $8000 was still due; so in 1830 and 1831 that a considerable debt still existed. Indeed, he annexes a correspondence with

Low, in 1832 and 1833, after the breaking off with Almy, from which it seems that Low, though before denying he was interested, then set up to Lippitt some rights under the contract, but did not comply with the terms of the assignment by paying half of the advance. In that correspondence he speaks of Lippitt's paying the balance to him in February, 1832; then more in detail in October, 1832, and November of the same year; and April 20, 1833, it seems to be still unsettled, and a balance recognized by Lippitt as due. In 1835, also, it is testified by T. R. Hazard, that Lippitt and the defendant both admitted money to be due for the original advance. But the difficulty as to the part interest, set up by Low, probably was one cause, beside others before adverted to, which prevented the going on longer with Almy, and delayed a settlement of the balance, till the conflicting rights of Almy and Low were adjusted. It seems that, in 1835, a suit was instituted by T. C. Kendall, as assignee of Low & Fenner, v. Thomas R. Hazard et al., which brought in question the title of Low to half the profits received by Almy, and it turned out to be defective, and he could not recover them. The cotton, in the mean time, was bought by himself, (Lippitt,) the defendant being his indorser.

Another reason for not going on under the contract, though the machinery remained not paid for, as stated in another affidavit by Lippitt, was the advice of Almy, not to do it, as Almy probably had got nearly enough to pay his own advance for the double speeder, (and that may be what he referred to in talking with Lippitt's son) and advised Lippitt that the other parties being bankrupt, he (Lippitt) might lose the cloth or the profits on what he let them have. But Lippitt did not pretend, then, that any more of the original advance had been paid, than is now admitted by the plaintiff. Perhaps Lippitt could have sued R. G. Hazard or his assignees, had he wished them to go on and furnish cotton and he furnish cloth on the terms of the contract; and possibly they might have been able to have compelled Lippitt to work up their cotton on those terms; or if not, to exonerate them from liability longer, to convey to him the machinery, and to let them retake it, and therefore lose the use of it, or the interest or its value. Neither, however, seemed to move in that direction, and hence some countenance is given to the idea that the payment had been completed; and, without the counter admissions and confessions concerning this, the rest might be sufficient to show it after so long a lapse of time. The defendant avers in his answer, also,—but it is supported only by the general facts just named, and C. Lippitt's evidence,—that little remained due to the plaintiff, and that C. Lippitt therefore informed the defendant, in Dec. 1835, when the mortgage was executed to him,

that the original advance had been paid, and the title became good in Lippitt. But from other averments in his answer it would seem, that he and the other mortgagees rather supposed that the plaintiff had forfeited or lost any title he otherwise might have had, by not recording what was regarded by them as a mortgage to him by Lippitt. That is the chief reliance in the argument as well as answer; and, from other facts in the case, it would be probable that they knew the claim of Hazard & Co. still to be due, and found, from the abrupt departure of one of the firm, who came to see about it, that a suit would be commenced for the machinery. Hence they had executed the mortgage of this and other estate in haste to the defendant, a brother-in-law, and to others, in order to give them preferences in his expected failure, and secure the property from the assignees of Hazard & Co., if they could, on the ground of so long possession undisturbed, or the invalidity of what they were advised was in law a prior mortgage, unrecorded. However the real truth may be as to the motives, that prompted to the mortgage to the defendant and others, by Lippitt, it is certain that, for any evidence which appears in the case, the plaintiff, as assignee of Hazard & Co. still had the legal title to the machinery, and that Lippitt's interest at law was merely an executory right, under a contract to have the machinery conveyed to him after paying the balance due for the original consideration advanced for it; or, in equity, the rights of a mortgagor—a balance still unpaid. He or Wilbur, his assignee, must prove such a payment or tender of it before having any right, even in equity, to the title. In law, Lippitt could have no real title till an actual conveyance from Almy; and, instead of the weight of evidence on this point being in favor of the defendant, even if his answer on it be responsive to the bill, which is questionable, it is the other way; and the presumption, as just shown, from several leading facts conceded, as well as positive evidence, is, that the debt had never been fully paid. As this then is deemed to be a mortgage in equity, and mortgages must be recorded in Connecticut if the mortgagee be not in possession, it becomes material whether Wilbur then knew of these facts as to the title or not. His knowledge is controverted in the evidence, and denied in his answer. I have before suggested that he had notice of it. All the circumstances of the relationship, which existed between Wilbur and Lippitt, the consulting with him at first and throughout in respect to his business; Wilbur being his indorser and taking this mortgage soon after Hazard claimed the machinery, and urged a settlement; and the reasons set up at first for avoiding Hazard's title; that his was a mortgage, but had not been recorded; all turn the scales in favor

of the probability of knowledge, sufficient at least to put him on inquiry, and bind him by any lien or title then outstanding.

We have before shown that such a mortgage is good against all having notice of it. In all cases in England and in this country, where there is a general provision, that a conveyance not recorded is void, it is either by a settled construction or express words, made void only as to third persons, i. e. subsequent purchasers or creditors, without notice of the first conveyance. [Berry v. Mutual Ins. Co.,] 2 Johns. Ch. 603; [Bumpus v. Platner,] 1 Johns. Ch. 216; Colby v. Kenniston, 4 N. H. 262. In France it was otherwise. Co. Litt. 290b, Hargrave's note; Wyatt v. Barwell, 19 Ves. 439. Having such knowledge, then, as to the existence of a mortgage, Wilbur cannot then, in law or equity, object to its not being recorded, and is bound by it and all its incidents and consequences, as if it was recorded. Hence he has only Lippitt's rights or interests, if he had this knowledge; or if he had not, and notice or knowledge was not necessary, he obtained merely Lippitt's interests.

Next, what was that interest? It was a right under the contract to use the machinery in conformity to the contract, and to have it conveyed to him on payment of any balance due on the advances made for it by Hazard & Co., and the plaintiff. In December, 1837, without any evidence of any increased title or power over the machinery, except an increased lapse of time from three years to five since the machinery had been run under the contract towards paying the advances by half the profits, and which had conferred no additional title, nor created any bar or estoppel, the defendant undertook to sell the machinery outright to Morgan & Fanning. And he did this though notified in November, 1836, by R. G. Hazard, of the plaintiff's claims from him by assignment to the machinery, and refused to deliver it up on this notice. This sale was a tort or wrong, which would render him liable to an action of trover for the value, as did the refusal, on a demand made by the agent of the plaintiff, to deliver up the property in November, 1836.

The rule of damages in trover would be the true value of the machinery when sold, and interest thereon given in the nature of damages, whether the value was more or less than the machinery sold for, or the interest more or less than any rents or use. But in equity the rule is, treating the matter as a mortgage, to require Wilbur to pay only the balance due; and hence, if less than the value of the machinery and interest since 1835, to let him have the benefit of it; but if not less, to return the machinery itself; and if destroyed, then to pay its value and interest, unless Wilbur did not own the whole, or have the beneficial interest in the whole. In the supplemental answer in this case the statute of limitations is pleaded, and must be considered. It could properly begin to run only from the demand and refusal or from the time of the sale, if the plaintiff choose to and legally could treat that as a tort. But the plaintiff does not choose to regard any prior act as a conversion, without any removal of the machinery, or refusal to deliver it; and there is no evidence of any prior tort; the possession taken by Wilbur under the mortgage of Lippitt's interests not being necessarily a tort, but rightful, if meaning to use and account for it under the contract, or pay the balance and keep it, and which was not rebutted to a certainty till the demand in 1836. The demand and refusal, therefore, are the first clear evidence of a conversion. St. John v. Standring, 2 Johns. 470; [Vincent v. Cornell,] 13 Pick. 294; [Strickland v. Barrett,] 20 Pick. 415; [Oriental Bank v. Tremont Ins. Co.,] 4 Metc. (Mass.) 6; [Vasse v. Smith,] 6 Cranch, [10 U. S.] 226; [Dench v. Walker,] 14 Mass. 499; [Melville v. Brown,] 15 Mass. 82; Ang. Lim. 327, 328; [Callis v. Tolson,] 6 Gill & J. 81; [Slaymaker v. Wilson,] 1 Pen. & W. 216. It was not six years from this demand till the service of notice of the filing of the bill, and hence the plea of the statute fails. It is very extraordinary that such delay should have occurred after the demand and refusal, there having been four years previous, and then nearly six following it before suit; and no intimation transpired of any intervening claim, except a letter by the plaintiff in 1840, stating he was advised to sue. Persons who sleep over their rights in this way must expect embarrassment and doubts; and if they succeed at all, it will be only because the law and the evidence seem to require it, though always clouded and uncertain by such unusual procrastination. One may hold possession of mortgaged property so long, being the mortgagor, as to raise a presumption that the debt has been paid; but in case of real estate, it must be twenty years. Ang. Lim. 490; [Trash v. White,] 3 Brown, Ch. 291; [Marquis Cholmondeley v. Lord Clinton,] 2 Jac. & W. 179; [Christophers v. Sparke,] Id. 234; [Jackson v. Wood,] 12 Johns. 242; [Hughes v. Edwards,] 9 Wheat. [22 U. S.] 497; [Monell v. Monell,] 5 Johns. Ch. 283; [Giles v. Baremore,] Id. 545. So if a mortgagee is in possession twenty years, the mortgagor cannot redeem, unless a clear admission is proved that it is held for a debt still, and is not foreclosed. [Elmendorf v. Taylor,] 10 Wheat. [23 U. S.] 152; Ang. Lim. 448, 449; [Marks v. Pell,] 1 Johns. Ch. 594; [Jackson v. Shearman,] 6 Johns. 21; [Barron v. Martin,] 19 Ves. 327. So if a debt be barred by the statute of limitations, it is still in existence to uphold a pledge, if the claim be not barred as to that. [Belknap v. Gleason,] 11 Conn. 160; [Thayer v. Mann,] 19 Pick. 535; [Vice v. Thomas,] 2 Cox, Ch. 123; [Colby v.

Everett,] 10 N. H. 429; Ang. Lim. 77; [Spears v. Hartly,] 3 Esp. 81. So a debt may be barred by the statute of limitations, though secured by a pledge, so as not to sue for that debt, and be still good for the pledge. Slaymaker v. Wilson, 1 Pen. & W. 219. (Semb.) The better view perhaps is, that the debt itself is not barred if the mortgage is not. Heyer v. Pruyn, 7 Paige, 470; [Jackson v. Sackett,] 7 Wend. 94. Where tort will not lie on account of a shorter statute of limitations, assumpsit will, if the sale of the article was within six years, or an account has been rendered within that time; as the last takes it out of the statute. Ang. Lim. 76; [Hony v. Hony,] 1 Sim. & S. 568; [Willet v. Willet,] 3 Watts, 277; [Lamb v. Clark,] 5 Pick. 193, 285; [Martin v. Mayor, etc., of Brooklyn,] 1 Hill, 545.

I have spoken of Wilbur's being liable in trover at law, for converting this property, and of the rule of damages. But whether he could be adjudged in chancery to pay the balance of the debt due to the complainant from Lippitt, or restore the property, might in one view be questionable, if the debt is barred, as it would seem to be, independent of the mortgage, by the statute of limitations. The general rule however is, as just stated, that a debt secured by mortgage is not barred by the statute of limitations, if the remedy on or for the article mortgaged be not barred. See Ang. Lim. 490, 500, 501. Here the remedy for the machinery is not barred, though it would clearly be for the debt, except for the circumstance just named, and on that see cases already cited. There doubtless are cases where in equity, if the circumstances and responsibilities of parties have changed essentially by delay, though not long enough to bar a recovery under the statute of limitations, it might show any relief in chancery to be inequitable, even if jurisdiction was otherwise clear in it over the case; and if inequitable, that the case should be left as at law where we find it. Mason v. Crosby, [Case No. 9,234;] Tufts v. Tufts, [Id. 14,233;] Ang. Lim. 170. A court of chancery, or the court acting on its chancery side, would say in such a case, it declined to interfere with extraordinary equity powers, in behalf of one who had slept over his rights so long as to render the enforcement of them in equity not equitable. 2 Story, Eq. Jur. §§ 771, 776; [Heaphy v. Hill,] 2 Sim. & S. 29; Newl. Cont. 242. But, declining here to dispose of this case in chancery would have been injurious to the defendant, in having his question considered and decided for him, that the contract between Lippitt and R. G. Hazard & Co. was a mortgage, and would have made him liable at law absolutely for the whole value of the machinery and interest since the conversion. Whereas now if going on in chancery, and if held liable there, as seems on the whole case proper,

it subjects him to pay only the balance of the debt, which may be less than the value of the machinery; and, if not less, subjects him only to return the machinery, and if that cannot be done, to pay only its value when converted, and interest since. Let a master then be appointed to ascertain the amount of debt due, and the value of the machinery when sold.

The balance due to the plaintiff is to be ascertained first, casting interest only after Sept. 1832, when Lippitt refused longer to go on under the contract. The repairs devolved on Lippitt and Wilbur, and the surplus of rents over what is allowed the plaintiff as interest, till 1836, belong to the respondent. In a bill in equity to compel the redemption of a mortgage on personal property against one who held possession of and claimed it, I see no objection to his being required to pay in damages the value of the property, if it has been destroyed, and he does not prefer to pay the balance of the debt charged upon it. [Wills v. Stradling,] 3 Ves. 378; [Clinan v. Cooke,] 1 Schoales & L. 41; Warner v. Daniels, [Case No. 17,181.]

But I do not propose now to settle the form of the final decree. Let one be entered on the points decided; and, after the report of the master, the rest of the remedy can be given in the shape of a specific performance of the original agreement required of Wilbur as assignee of Lippitt with knowledge, or to restore the property held in trust, which belongs to the plaintiff; or to account for its value, if not choosing to discharge the balance of the debt which is an incumbrance upon it.

[NOTE. This case was reversed, under title of Wilbur v. Almy, 12 How. (53 U. S.) 180, on the following grounds: (1) The assignment under which complainant claims was executed for the assignees of Hazard & Co. by R. G. Hazard, and was ratified by only one of the assignees, and there was nothing to show that Hazard had authority to act for the assignees, who must unite to pass any title to the property jointly held by them. (2) The evidence tended to show that the assignment to Almy was as collateral security for a debt due him by Hazard & Co., which debt had been fully paid by the profits on the contract before the commencement of this action.]